## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 14 2016, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew J. Sickmann
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| L.G. and D.D., <br><br> *Appellants-Respondents,* <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | June 14, 2016 <br><br> Court of Appeals Case No. 89A01-1511-JT-2067 <br><br> Appeal from the Wayne Superior Court <br><br> The Honorable Darrin M. Dolehanty, Judge <br><br> Trial Court Cause No. 89D03-1507-JT-26 |

**Altice, Judge.**

## Case Summary

[1] L.G. (Mother) and D.D. (Father) (referred to collectively as Parents) appeal the involuntary termination of their parental rights to J.D. (Child). They challenge the sufficiency of the evidence supporting the termination.

[2] We affirm.

## Facts & Procedural History

[3] Child was born to Parents on March 6, 2014, and remained in their custody and care thereafter. On or about June 14, 2014, Parents and the maternal grandparents brought Child to the hospital with an injury to his mouth – a torn frenulum. Parents offered no explanation for this injury. Upon further examination, medical staff discovered that the infant had seven fractures at various stages of healing. Child, at only three months old, had four broken ribs and a fractured arm, left femur, and right ankle. Again, Parents could not explain Child's multiple, serious injuries. The hospital contacted the Indiana Department of Child Services (DCS).

[4] Amy Denton, an assessment case manager with DCS, responded to the hospital and spoke with medical staff and Child's family. Denton spent over three hours at the hospital assessing the situation. In speaking with Parents regarding Child's injuries, Denton observed that both Father's and Mother's demeanor seemed very calm. She believed their "lack of emotion in this situation was inappropriate." *Transcript* at 32. Parents could offer Denton no explanation for Child's injuries. Accordingly, Denton took Child into protective custody, and DCS filed a petition alleging Child to be a child in need of services (CHINS).

[5] At the detention hearing on June 17, 2014, the trial court authorized the continued removal of Child. In its order the court found that Child needed protection due to his "seven fractures that cannot be explained by the parents and that do not appear to be the result of accidental injury." *Exhibits* at 4. The court further explained the emergency nature of the situation as follows:

> [T]he child was taken to the hospital because of a torn frenulum. That injury in a three month old child is unlikely to be because of accidental injury. The parents had no explanation for that injury. A skeletal survey showed four fractured ribs, both legs fractured and a fractured arm. The fractures appeared to be of different ages. The parents could not explain the injuries.

*Id*. at 4-5. DCS filed a CHINS petition following the hearing.

[6] Criminal charges were filed against Mother and Father as a result of Child's injuries. Parents were arrested on or about July 1, 2014, and remained incarcerated awaiting trial. They have been unable to visit Child since their arrests.

[7] At an August 11, 2014 fact-finding hearing, the trial court adjudicated Child a CHINS. In its order, the court, once again, noted the infant's multiple fractures, which occurred at different times, and the injury to Child's mouth. These serious injuries occurred while Parents had the control and custody of Child.[1]

---

[1] Ind. Code § 31-34-12-4 establishes a rebuttable presumption that a child is a CHINS because of an act or omission of the child's parent(s) if the State introduces competent evidence of probative value that:
   (1)  the child has been injured;
   (2)  at the time the child was injured, the parent…:

[8] Following the dispositional hearing on September 5, 2014, the trial court entered an order in which it found that Child "needs a home where he is safe from physical injury" and, thus, granted wardship of Child to DCS. *Exhibits* at 13. The court ordered Parents to participate in services but noted that due to their pending criminal charges they had been advised by counsel not to participate in "many services." *Id*. The court found that removal was in Child's best interests and that reasonable efforts to prevent or eliminate removal were not required due to the emergency nature of the situation. The court explained:

> the child was taken to the hospital by the parents because of a torn frenulum. Medical personnel then discovered that the child had four fractures to the back ribs. That type of injury is usually caused by squeezing. The child had a fracture to the right tibia. The nature of that fracture is usually the result of yanking or jerking. The child also had a fractured femur. The fractures occurred at different times. The parents had no explanation of how the injuries occurred.

*Id*. at 14.

[9] DCS placed Child with relatives on October 12, 2014, with whom he has since remained. Child has thrived in this family's care and has recovered from his

---

    (A) had the care, custody, or control of the child; ….

  (3) the injury would not ordinarily be sustained except for the act or omission of a parent…; and

  (4) there is a reasonable probability that the injury was not accidental.

Parents did not rebut this presumption.

injuries. The foster parents, who have two young children of their own, wish to adopt Child.

[10] On May 27, 2015, Father pled guilty pursuant to a plea agreement to class B felony neglect of a dependent. Mother followed suit on June 16, 2015. They were each sentenced to ten years in prison, with five of those years suspended and three years on probation. The convictions were based on the serious bodily injuries sustained by Child while under their care.

[11] The trial court held a permanency hearing in the CHINS case on June 8, 2015, at which time the plan for Child was changed to termination of parental rights and adoption. Thereafter, DCS filed a petition for involuntary termination of parental rights. The termination hearing was conducted on October 29, 2015.

[12] The evidence presented at the termination hearing established that minimal services were provided to Mother and Father while they were in the local jail. From February 2015 through June 2015, Father had weekly sessions with Thomas Brazzell of the Children's Bureau. They worked on father engagement, self-care, and other parenting issues. Father was engaged during the sessions and expressed remorse for what happened to Child, but he never took responsibility for the injuries. For about six months, Mother participated weekly in a program called Lifeline, which addressed parenting, employment, and coping skills. At the time of the termination hearing, Mother's earliest possible release date from prison was June 30, 2016, and Father's was November 30, 2016.

[13] Family case manager (FCM) Danielle Drew recommended termination of parental rights. She noted Parents' continued incarceration – due to their victimization of Child – but emphasized that the primary reason for her recommendation was that neither parent has explained Child's various injuries. FCM Drew opined that termination was in Child's best interests:

> I believe [Child] deserves a safe, stable environment, free from abuse or neglect. I feel that he has been through a lot of trauma since birth…. And he is now safe and stable, and in a very, very appropriate environment. And it would be very traumatic for this child to be placed anywhere else at this point. In addition to that, we cannot ensure his safety returning to the parents.

*Transcript* at 67.

[14] CASA Director Karen Bowen similarly recommended termination of parental rights. Regarding Child's best interests, the CASA noted that Parents remained incarcerated, as they have been for nearly all of Child's life, and that Child will have been removed for two years by the time of their release. Even after their release from prison, Parents would need additional time for services before any potential reunification. The CASA opined that this would be "so unfair" to Child, who had established a "beautiful" life with his foster family. *Id*. at 81, 87. Moreover, the CASA noted the difficulty in providing proper services to Parents where Child's injuries remain unexplained. Under these circumstances, the CASA stated, "I could never say that I was comfortable reunifying a child." *Id*. at 83. In closing, the CASA emphasized that Child was "a victim of his parents, not a mistake." *Id*. at 114.

[15] At the conclusion of the hearing, the trial court took the matter under advisement. The court issued its order terminating parental rights the following day. In addition to findings of fact, the trial court entered the following conclusions in support of its judgment:

> A. There is clear and convincing evidence to show that [Child] has been removed from [Parents] for at least six (6) months under a dispositional decree….
>
> B. There is clear and convincing evidence to determine that the conditions that led to this child's removal from the parents, and the reasons for his placement outside the home of the parents will not be remedied. The child had been seriously injured prior to removal from his parents. The injuries occurred at different times. The injuries occurred while the child was under the care and supervision of the parents. The parents have not been able to provide a reasonable explanation for how the child was repeatedly injured.
>
> Additionally, there is a reasonable probability that continuing the parent-child relationship poses a threat to [Child's] well-being. [Child] suffered significant injuries, imposed at different times, and was again injured immediately prior to removal. The parents have not been able to reasonably explain the cause of the injuries. Since the child's removal from the parents, his injuries have resolved and he is healthy and happy.
>
> C. There is clear and convincing evidence to establish that termination of the parent-child relationship is in the child's best interest. Under the parents' care he suffered numerous, significant injuries, including broken ribs, a broken leg, a broken ankle, and a torn frenulum. Since

> removal from the parents, the child's injuries have resolved and he has become healthy, happy and bonded to his foster family.

> D.     There is clear and convincing evidence to show that the DCS has established a satisfactory plan for [Child's] care and treatment, that being adoption.

*Appendix* at 66.  Parents jointly appeal from this order.

## Discussion & Decision

[16] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.*  Instead, we consider only the evidence and reasonable inferences most favorable to the judgment.  *Id.*  In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous.  *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.*  Thus, if the evidence and inferences support the decision, we must affirm.  *Id.*

[17] The trial court entered findings in its order terminating parental rights.  When the court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review.  *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).  First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment.  *Id.*  "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference."  *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.

1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[18] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[19] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and there is a satisfactory plan for the child's care and treatment. I.C. § 31-35-2-4(b)(2)(C), (D).

[20] On appeal, Parents argue that the evidence was insufficient to support the involuntary termination of their parental rights. They challenge several of the trial court's specific findings and its conclusions as to I.C. § 31-35-2-4(b)(2)(B)(i) and (ii), as well as I.C. § 31-35-2-4(b)(2)(C).

[21] We turn first to Parents' challenges regarding certain factual findings entered by the trial court. They argue that findings number 6, 8, 9, 19, 20, and 30 are not supported by the evidence. We will address each in turn.

[22] Finding number 6 provides: "FCM Denton recalled that she was at the hospital for approximately three and one-half (3 ½) hours, and that Father and Mother were both oddly calm while at the hospital." *Appendix* at 63. Parents challenge this finding by arguing that FCM Denton had no prior experience with them and was, thus, unable to adequately evaluate their demeanor. They also point to testimony from a family member who "offered a different opinion" regarding their demeanor at the hospital. *Appellants' Brief* at 15. We reject Parents' invitation to reweigh the evidence. FCM Denton's testimony supported this finding.

[23] Parents next challenge findings number 8 and 9, which provide:

> 8.  The parents did not offer FCM Denton any explanation for the child's injuries.

9. Because the child was taken into protective custody on June 14, 2014 (a Saturday), a Detention hearing was held on June 17, 2014. The Court authorized the continued removal of the child, finding that returning the child would be contrary to his welfare. The child was found to have "seven fractures that cannot be explained by the parents and that do not appear to be the result of accidental injury." Responsibility for the care and treatment of [Child] was ordered to the DCS. (See Exhibit 2).

*Appendix* at 63-64. Parents do not dispute that these findings are supported by the evidence. Rather, they argue that these findings do not support the judgment because "lack of an explanation is not a condition supporting removal, which the parents are able to remedy." *Appellants' Brief* at 17. While Parents frame their argument as a challenge to these findings, it is not. *See Quillen*, 671 N.E.2d at 102 (findings will be found clearly erroneous "only when the record contains no facts to support them either directly or by inference").

[24] Parents next claim that findings number 19 and 20 are not supported by the evidence. These findings were based on the foster mother's testimony about the inconsistent phone calls and communications from Mother and Father regarding Child. Parents do not dispute that the findings are consistent with the foster mother's testimony. They simply assert (with no citation to the record) that they called when able and that the court failed to consider in its findings that they were unable to place frequent phone calls once transferred from jail to prison. Once again, we reject the invitation to reweigh the evidence.

[25] Finally, Parents argue that finding number 30 is not supported by the evidence. This finding indicated that Parents have not visited with Child since he was three months old and that at the time of the termination hearing, Child was just over one and one-half years old. Parents' sole challenge to this finding is that it was impossible for them to visit child while incarcerated. This observation, however true, does not make the trial court's finding clearly erroneous.[2]

[26] Having upheld the trial court's findings, we now turn to the court's conclusions with respect to I.C. § 31-35-2-4(b)(2)(B). In this regard, we observe that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). The trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Parents' care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the former requirement—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in Child's

---

[2] It is well established that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1235-36 (Ind. 2013). In this case, not only did Parents' criminal behavior result in a substantial period of incarceration during Child's young life, but Child was the direct victim of their criminal acts.

removal or continued placement outside Mother's and Father's care will not be remedied.

[27] In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.*

[28] The trial court's conclusion that the conditions resulting in removal or continued placement outside Parents' care will not be remedied was expressly based on the severe nature of Child's injuries and Parents' continued failure to provide a reasonable explanation for how the infant was repeatedly injured while under their care and supervision. Parents do not dispute the serious nature of the injuries suffered by Child while in their care or that no explanation for these injuries has been offered by them. Rather, they hang their hat on the fact that DCS has been unable to pinpoint the precise cause of the various injuries or establish that the infant was injured at the hands of either parent.

[29] Under the circumstances of this case, we find Parents' argument wholly without merit. Their three-month-old infant was brought to the hospital with a tear inside his mouth. Beyond this injury, the infant was found to have seven broken bones at various stages of healing, indicating that the fractures occurred over a period of time. In his short life, Child had suffered four broken ribs, a broken arm, and two

broken legs while in the care of his parents. At no time have Mother or Father offered an explanation for these apparently non-accidental injuries. They did, however, both plead guilty to class B felony neglect of a dependent based on the serious bodily injuries sustained by Child.

[30] While incarcerated for victimizing their infant, Parents did eventually participate in several months of services relating to parenting skills and employment. The services available to them were indeed limited by their incarceration, and they were unable to visit with Child. Regardless of the services offered or utilized by Parents, the fact remains that they have not explained how their infant sustained such serious injuries while in their care. Only Mother and Father can shed light on this crucial issue. The fact that they have chosen to remain silent regarding the details of Child's tumultuous first few months of life cannot compel the return of Child to their care. DCS's legitimate concerns about returning Child to Parents' care clearly have not been alleviated. Accordingly, the trial court's conclusion that there exists a reasonable probability the conditions resulting in Child's removal and continued placement outside Parents' home will not be remedied is supported by its findings of fact and not clearly erroneous.

[31] Parents also challenge the trial court's conclusion that termination is in Child's best interests. In determining the best interests of a child, a trial court is required to look beyond the factors identified by DCS and to consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). The court must subordinate the interests of the parents to those of the child, and need not wait until the child is irreversibly harmed before terminating the parent-child

relationship. *Id.* "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).

[32] In making its determination regarding Child's best interests, the trial court observed: "Under the parents' care [Child] suffered numerous, significant injuries, including broken ribs, a broken leg, a broken ankle, and a torn frenulum. Since removal from the parents, the child's injuries have resolved and he has become healthy, happy and bonded to his foster family." *Appendix* at 66.

[33] The evidence establishes that Child is thriving in his current placement and has recovered from the multiple injuries suffered during his short time with Parents. Child has been with his foster family the majority of his life. Further, as a direct result of Parents' crimes against Child, they have not seen him since June 2014 when he was an infant. Parents are not bonded with Child, and even after their release from prison, they would have a "long road" ahead of them before any possibility of reunification with Child. *Transcript* at 77. Both FCM Drew and the CASA discussed the importance of permanency and stability in Child's life and opined that termination was in his best interests. *See In re J.S.*, 906 N.E.2d at 236 ("the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests"). The trial court's conclusion that termination is in Child's best interests is not clearly erroneous.

[34] Judgment affirmed.

Bailey, J. and Bradford, J., concur.